Good afternoon. May it please the Court, Matthew Martel of Jones Day for Appellant U.S. Bank National Association as Indentured Trustee. With the Court's permission, I was planning on requesting one minute for rebuttal, but I think we've established that it's not possible to make an argument for a minute. You might want to do two. With your permission, I'll request two. Thank you. It does seem as though it's student loan day today. These particular deals serve an important function in the market in that they provide funding for students that are attending college. So, with some familiarity with these types of transactions, and the concern the Trust have and the owners of the Trust is that somehow the special servicing agreement, which had FMER, and then it gets replaced by U.S. Bank, and things are falling apart, and they're losing in court, and we've got a problem, and we've got to replace that entity with somebody else. So, in comes the Odyssey Agreement. There's nothing wrong generally with that, is there? Indeed, Your Honor, there is. First of all, I mean, just generally, I mean, it seems to me your first argument is they can't do it under the granting clause at all, but then it comes down to there are, I can think of at least eight or more significant differences between the special servicing agreement and the Odyssey Agreement. Put that to the side. You're saying at the beginning they can't try to protect their investment at all? Indeed, Your Honor, and if you'll indulge me a little bit. At all? On these facts, Your Honor. Okay, why don't you explain that to us then. Sure. So, I'll go back and explain the structure of the Trust a little bit and who is entitled to control the deals generally. But to start with, there are two specific provisions, 3.07d in the indenture and 3.07e that provide the issuer trust, and these are issuer trusts because they issue debt to note holders, which means they took on obligations to note holders. But 3.07d and 3.07e expressly reserve for the issuer trust the obligation to take remedial action when they call it default with respect to servicing. Now, by implication, that suggests that the issuer trusts also have a residual obligation in monitoring servicing in some fashion. But as we point out in our papers, no such default has been noticed under the circumstances. So, the issuer trust obligation to appoint a new servicer, odyssey, is not triggered under the circumstances. And there's a reason for that, right? You have a Delaware Statutory Trust and the entire deal is built around the Delaware Statutory Trust. The trusts don't have any operations of their own. They're not corporate issuers. They are Delaware Statutory Trusts, and so they have contractual relationships with parties who provide services to them. They took in the loans, they issued the debt, and they made commitments to the note holders and to the indenture trustee that as long as the debt is outstanding, they would perform certain obligations that are set forth in the agreement. But what they did at the same time was they conveyed under the granting clause, and the granting clause is extraordinarily important in securitizations, the trust conveyed all rights, powers, and options that they have in the deals with respect to servicing agreements, the collateral, and all basic documents to the indenture trustee for the note holders under the deal. Sure. So, you know, I picked up from the briefing that this granting clause is really important, and so one of the things I'm reading is it says, you know, quote, all the issuers write title and interest in and to the following, and then it goes to Subjection B. It says all servicing agreements. Just at the very outset, does that mean, in your view, that no additional servicing agreements can be entered beyond the SSA? Additional servicing agreements can be entered beyond the SSA. And if you'll indulge me, I'll explain the process for that. Okay. So just a roadmap, though, and I'll indulge you. I'm happy to indulge you. But the roadmap is additionals can be entered, but I assume what you're going to tell me next is the additional that was entered. In this case, there's problems with that one. Am I telegraphing or at least expecting where you're going to go or not? In part, you're right. There are two problems. One is the process that was followed, and the other is the substance of the agreement. And Mr. Hannon is planning on talking about the reasons in which. Let me just add to that because it really ties in with my first question. Are you saying that the entering into the Odyssey Agreement violates the granting clause just by appointing another servicer? Without the indentured trustee's consent, correct. Didn't the same thing happen with the U.S. Bank? When the U.S. Bank was appointed, didn't that same thing happen? The indentured trustee is a signatory to the Special Servicing Agreement. The U.S. Bank was a backup, right. Exactly. And the indentured trustee agreed to those terms. What you have here with the Odyssey Servicing Agreement is the issuer trusts, through the owners, have attempted to put a new special servicer into the deal without the consent of the indentured trustee. And they've done that in the absence of a default that's been called with respect to the existing servicer. Why don't you ask Jessica's question because then I'm going to pick up on that after that. Go ahead. Oh, no. I just wanted – the other thing I picked up from the briefing is that these agreements need to be strictly construed. And so I guess my thought is can you take us to the provision that you believe, and maybe you already have, if it's the 3.07, but the provision that says the trustee's consent is required? Sure, Your Honor. It's three provisions. In the indenture, it's 3.07F, 3.07C, and 3.07A. Right. Okay. So – I'm sorry. If you're finished with that, I was going to – Okay. I just – I wanted to emphasize again that the deal that the certificate holders, the residual equity owners struck under the indenture for the issuer trust was, as long as the obligations are outstanding to Mr. Hannan's clients and other note holders like them, if it's a right, a power, or an option with respect to the operation of the trust, it's held by the indenture trustee, and they can exercise it for the benefit of holders. If it's an obligation of the trust, that is expressly reserved for the trust. And this makes sense, right? The trust agreed to perform certain obligations, but they didn't retain the right to do whatever they wanted to, pursuant to the powers and purposes of the trust agreement. If they had retained that right, then the note holders would have no protection whatsoever, and the granting clause would be meaningless. That segues into my question. Isn't your much stronger argument that the entering into the Odyssey agreement violates the granting clause by Odyssey, which is now controlled by BCG, that it assigns to itself several rights that are reserved to the indenture trustee for the benefit of the note holders in the basic documents? No doubt. Isn't that the stronger argument that you have, rather than saying you can't appoint another servicer, but what they did here violates the granting clause by assigning several rights, and I'll go through them with your opposing counsel, that just simply aren't in the basic special servicing agreement, or the basic documents? Not to be difficult, Your Honor, but to an indenture trustee that bargains hard for a granting clause, I think the two arguments are equally compelling under the circumstances. There are limited circumstances where a servicer can be appointed. This is not one of them under the circumstances. Let's assume I'm more focused on the second one, that they went beyond. It wasn't just a replacement. It's a replacement with a bunch of other things that are added to that that are to the benefit of the odyssey and the entity that controls it. Yes, Your Honor, and the particular provision that I would find the most troubling, and again, it's in our papers, Mr. Hannon intended to cover, but I'm pleased to cover it here, is the provision where in the odyssey servicing agreement, when it comes to the right to terminate odyssey for a cause, the issuer trusts, presumably on direction of the owners, have themselves retained a veto right over the indenture trustee's ability to terminate odyssey for cause. In the FEMA, the special servicing agreement, there's a provision that says the indenture trustee shall terminate for cause, and so termination will never be possible under the odyssey servicing agreement if it were to be accepted as it is, because there are never any circumstances where the equity owners here would ever consent to the firing of their affiliate, odyssey, under the for cause provisions. There just aren't any. We would have to go to court to attempt to compel them, and that, Your Honor, is... One of the owners actually controls odyssey, right? The owners control odyssey. Affiliate, affiliate. And the other party to odyssey has resigned, so the owners are essentially odyssey at this stage. Sure. Can we talk about just retention under the granting clause a little bit more? So, I mean, in order to retain certain rights, does the granting clause... I mean, are we looking for, you know, all rights that aren't expressly divested are retained, or do we need something that expressly identifies the rights that are retained? Did you answer my question? I do, and it's a very, very important question, and it's important in securitization structures, in particular securitization structures that, like here, involve Delaware Statutory Trust. It's different in a corporate issuer context, but the corporate issuer is a real operating entity. Here it's very, very important because there are often disputes over which of the deal parties has the obligation or right to take certain actions. The way the granting clause works is the issuer trusts are created. They get the assets. They convey all rights, powers, and options. Everything goes to the indenture trustee under the indenture. So if it's a right, a power, or an option, it goes to the indenture trustee. If it's an obligation, it is retained by the trust. This is the exercise that the district court did not go through under the circumstances because at the end of the day, the decision rests in large part on their conclusion that the trust had the right, the authority, the power, the obligation, and that's not how the granting clauses work. But to finish my response to your question, there are circumstances, I expect, when you pick through the governing agreements and the Phoenix Light case confirms this, I think, where the indenture trustee can then reconvey or confer rights back on to the issuer trust. Everything goes over to the indenture trustee under the indenture and then certain rights are conferred back on them. And a good example of that might be the right to... I want you to finish because it's all very useful. But I guess my thought is if I'm tracing back what you're saying, this is almost like what's very distant from, but first your contract principle that duties are delegated, rights are assigned. And so what you're basically saying is if I'm tracing back what you're saying, what you're basically saying is these granting clauses follow that kind of more traditional pattern unless we see something that differs from that. Have I traced that back so far? You have. And that's the large body of New York case law that particularly more recently has focused on the scope of the granting clause has reached exactly that conclusion. The granting clause, where it is broadly worded as these granting clauses are, are absolute in nature. When it says all rights, powers, and options, it means all rights, powers, and options. It should be construed in that manner. The San Antonio case reaches either the wrong conclusion or it's used in the wrong way by the district court. Because one reading of the San Antonio case, which is a Delaware case interpreting New York law, is that indentures are to be strictly construed. Well, indeed they are, right? And we're happy to accept the strict construction here because the granting clause is so broad and very detailed as well. Where the San Antonio case was either misunderstood or misapplied under the circumstances is the district court appears to have used it in many instances to ignore rights and powers that were expressly conferred on the indenture trustee, construed the documents in many instances against the indenture trustee's proffered interpretation and ignoring the breadth of the granting clause here. Did you want a specific example? I didn't mean to interrupt you. Were you asking for one? Okay. Sorry. It's what I asked for that idea. Okay. Thank you. Good morning, Your Honors. I still believe it is the morning. May it please the Court, Michael Hannan on behalf of note holders with an interest in the trusted issues here. I want to pick up initially on Judge Ambrose's question about the specific terms of the Odyssey Agreement violating the grant of the indentures. Because we think this is clear, we think it is a blatant violation of the grant that requires reversal, not simply remand. The terms of the Odyssey Agreement, not just the fact of it, must comply with the trust basic documents, including the grant of the indenture. The indenture, as we have discussed, absolutely granted all servicing agreements to the indenture trustee. The Odyssey Agreement, however, would affirmatively prevent the indenture trustee from removing Odyssey as the servicer for the trust, even for cost. That would divest the indenture trustee of its rights absolutely. It would breach the fundamental promise made by the trustee. The Odyssey would have to approve its own removal? That's correct. That's correct. And it's actually the owners who would have to approve Odyssey's removal, but as Mr. Martel said, the owners are now Odyssey. There is no distinction. At the time that this case was presented to the magistrate… One of the owners is now Odyssey. I don't think Citibank is involved. Citibank is no longer an owner. So right now the VCG is it. They are the owners and Odyssey is VCG. I got it. BPA is gone, Citibank is gone. It's a purely conflicted arrangement. And so the Odyssey… From the beginning, it strikes me as one gigantic conflict because unless I'm missing something, the way it was initially set up, U.S. Bank was there to collect on defaults, but it had a built-in incentive to not collect on defaults. Because am I missing something? Because it was being reimbursed on the amount of defaults that it had? Well, that was the allegation made below, and I can't speak for U.S. Bank, but I know that U.S. Bank argues in its papers, and the record reflects, U.S. Bank didn't get a dime from special services, and they outsourced that to others. And what was critical about the original arrangement was that the indentured trustee signed off on it. And we're not here to say that there is no scenario where a new special servicing agreement might be better for note holders, might be better for the trust in general, but this particular servicing arrangement, because it would affirmatively prevent the indentured trustee from removing Odyssey as servicer, even because is problematic, requires reversal on its face. The owners have no real response to this point in their papers, because we don't think there is one. They argue generically that the indentures, as we've discussed, must be read strictly, I think, is the language used in that case. But they still need to be read. And under New York law, a contract is, an indenture, is a contract like any other. Plain language of the grant is absolute and unequivocal. There are also arguments made by the owners that the original servicing arrangement gave the trust the right to terminate the servicer. However, that's a non sequitur. No prior servicing agreement did or could prevent the indentured trustee from terminating or removing a servicer for cause. The district court actually considered this precise issue, the lack of a for-cause removal provision. I think the problem with the magistrate's decision, among others, is that the magistrate considered this provision along with a host of other new provisions in the Odyssey agreement and held that, well, not every servicing agreement must be the mirror image of every other. Unfortunately, that analysis missed the point entirely. The salient question, as Judge Amber pointed out, is whether any new deviating provisions independently pass muster under the basic documents. And the for-cause removal provision, among the many others we identify in our papers, do not. Secondly, the Odyssey agreement runs afoul of provisions against self-dealing in the basic documents. There are separateness covenants in the indentures that forbid the trust from engaging in non-arm's-length deals with affiliates. The Odyssey agreements are not an arm's-length transaction by definition. The same person, Don Uteritz, both directed the trust to sign the agreement with Odyssey and actually signed the agreement for Odyssey. Can I just pick up on that arm's-length point? Because I think I can turn to it. This is section 3.23L. Am I thinking the same section you are? You are, you are. And so this sentence reads, quote, the issuer will maintain an arm's-length relationship with each seller and any affiliate thereof, the depositor and any affiliate thereof, and any of the issuer's affiliates. So I get that arm's-length relationship is required. But I don't know if the second sentence then defines what might constitute arm's-length, because then it says, quote, any person that renders or otherwise furnishes services to the issuer will be compensated by the issuer at market rates for such services that renders or otherwise furnishes to the issuer except as otherwise provided in this indenture, quote. So I guess my question is, if there are affiliates on both sides but are still dealing with each other at market rates, is that sufficient for an arms-length transaction? Maybe. We provided the court with a definition of arm's-length, which means you can't have the same party on both sides. But again, I guess my thought is if this paragraph stopped at the first sentence, I might really buy in to your definition. What's throwing me is the second sentence. And does the second sentence then say, this is the definition of arm's-length. There must be a market rate transaction. As long as it's market rate, affiliates can do it because that's sufficiently, I suppose, arm's-length because the result that they reach is indicia that it must have been arm's-length. That may be one way to arrive at what is and what is not market rates. The issue with the Odyssey Agreement is that there are a host of provisions in there that may or may not be market rates and could be changed unilaterally by Odyssey to be something other than market rates. So maybe a 10% commission is market rates. Maybe it's not. They can unilaterally change that to 20 or 30. There's a provision in the Odyssey Agreement, Section 5B, that says they can determine their own servicing fees. Those aren't even disclosed. Maybe they're market rates. Maybe they're not. And so at a minimum there's a fact question here that the lower court didn't wrestle with as to whether this self-dealing covenant was compliant. Do we really have to get into that? I don't think so, Your Honor. I think it's so clear that the specific terms of the Odyssey Agreement violated the grant that the case should be reversed. It may theoretically be that there is a servicing agreement that could be created, should be approved by the indentured trustee, and that the note holders would get behind because it would actually make servicing better. But first, what happens? Odyssey, you're not asking us to remove Odyssey, or are you asking us to remove Odyssey? We're asking you to invalidate the Odyssey Agreement. We should be tantamount to removing Odyssey. Well, it's not even in place. The incredible thing is that one of the reasons that the lower court found for the Odyssey Agreement not violating the basic documents was that a waiver agreement had been put in place such that the Odyssey Agreement didn't go into effect. Because one of the myriad problems with the Odyssey Agreement and how it obviously amended, waived, supplemented the deal at the time is that the Odyssey Agreement required the original servicer, FEA, to say historically I've taken all the newly defaulted loans and I've sent them to the special servicer. Now that Odyssey is in place, I'm going to send all my newly defaulted loans to Odyssey. But there was no provision in the agreement to make that change. And so there needed to be a revision, an amendment, a change to the basic documents to facilitate that. Can I just follow up on that? I mean, Odyssey didn't take over the servicing of loans that were previously served under the SSA, right? Correct. So I guess my thought is if they didn't take over that servicing, they just, this is an inexact term, just kind of shunted the flow of business to them as opposed to the original servicer under the SSA. Why does that shunting conflict with the basic documents? Well, there are many reasons. I'm saying as a practical matter that's what Your Honor is calling shunting. I don't know. Required changes to the basic documents. Why? Because the basic documents say you can enter into some additional servicing agreements, right? Right, but they also say they have an arrangement whereby the servicer has to send loans to an existing special servicer to change that you need to amend those documents. And you need to get, what, a venture trustee consent? Exactly, as well. Okay, you know what? I need another notepad. Can you just repeat what you just said just so I can trace back what you said? Okay, all right, yeah, get your notepad. And certainly, so the change, I was talking about the waiver agreement, which is pretty extraordinary because what the magistrate held is that, well, because the odyssey agreement is not being implemented, I conclude there is no conflict with the basic documents. The logical conclusion being that if it had been implemented, there would be a conflict with the basic documents. It's a fairly extraordinary concession that there is a conflict. Certainly, we believe that the sweeping prohibitions on these trusts without the consent of the venture trustee and the note holders here were violated. It's section 3.07 of the agreement, but it's not just 307A. It's 307C. It's 307S. They're broad. They're explicit. They're all-encompassing. They evidence, in our view, a very obvious intent to prohibit the trust from making changes of any kind to these deals without the consent of note holders and the venture trustee. It's not that changes can't be made. It's just that they require the consent of the real economic stakeholders in the trust assets. The district court acknowledged section 3.07, but they construed it too narrowly, particularly on summary judgment where, given the posture of the case, the district court necessarily concluded that there was no factual issue as to whether any aspect of this odyssey agreement in all of its terms altered any aspect of any one of the many basic documents or any terms of the collateral in any way. We don't think the record supports that conclusion, particularly on summary judgment. And even if it did, and it so plainly did violate section 3.07, there's no question, the record's pretty clear on this, that the odyssey agreement was a deliberate attempt by the owners to circumvent section 3.07. It was deliberately crafted to reform the servicing regime. We could talk about technically whether it actually addressed the prior servicing, but the clear purpose was to reform servicing, direct all the newly defaulted loans to odyssey, without triggering the rating agency condition and without triggering the consent requirement. In fact, if the owner's intent was to replace the special servicer with odyssey, that's a matter of public record. In a published Florida decision, the court can take judicial notice. So let me just trace back. What you're saying is before that shunt was possible, notice was needed to be given to the rating agencies and consent was needed in 3.07C or whatever provision it is? Yes, but two separate requirements we think both failed. The consent of note holders of the indentured trustee was required under section 3.07 for any modification, amendment, supplement, waiver of any time. Any basic document. Any. And not just, if you look at 307F, it's not just any one of those waivers, changes, amendments to the documents. It's any agreement to do the same thing. There's a belt and suspenders aspect to 307F that shows how broad the provision was and how clear the idea was the trust campaign changed the deal without the indentured trustee and note holders approving. As to the rating agency's condition, there's a provision in the existing special servicing agreement that says that no amendment can be made to that agreement without getting positive consent from the rating agency. Meaning that the owners present the Odyssey agreement to the rating agencies and the rating agencies affirmatively pronounce, we're okay with this. It's not going to impact the deal or the notes. You can go forward. That letter never happened here. Never happened here. And the owners knew they couldn't satisfy it. But what they did is they said, well, we can't satisfy it. How do you know that? How do you know the owners knew they couldn't satisfy it? Well, because we had their subsequent conversations with the rating agencies where what the owners did was rather than satisfying the amendment provisions in the existing servicing agreement, they focused on provisions in the indenture that are ambiguous that they believe allowed them to appoint a new servicer for six trusts through negative rating agency consent. And by that I mean they would tell the rating agencies, look, here's our new Odyssey agreement. Tell us in 10 days if you have a problem. If not, it's okay. It's a much lower threshold. And with busy rating agencies covering thousands of these deals, fairly easy to satisfy. But the agency could have gotten back to them and said, we need more time. Well, they did. But the position the owners took was that after 10 days of sending this notice to the rating agencies, they had approval. They had satisfied that condition. Subsequently, what's shown in the record is when the owners negotiated with the rating agencies, the rating agencies didn't give their approval. They weren't convinced. But what's really telling is that the owners gave their notice to the rating agencies on November 25th of 2014, the Tuesday before Thanksgiving. They couldn't have picked a day where it was more likely that 10 days would go by and the rating agencies wouldn't do it. They could have picked it on the Wednesday. Come on. I thought Tuesday would be the ideal day. But the idea is, and I've gone on somewhat of a tangent, that clearly the purpose of this agreement was to end run all these provisions. And what the magistrate judge said below was, look, the substance of what was accomplished here doesn't matter because the form, it technically complies. We submit that was also error. The district court failed to consider whether this kind of deliberate end run around the consent requirement, around the rating agency requirement, breached the implied covenant of good faith and fair dealing. We cite the Emprasis and Light Square cases in our papers. They're directly on point. The owners only attempt to distinguish those cases is to say, well, they involve trust indentures. Trust indentures are a contract like any other. That's a distinction that makes no difference. And what's really telling is that the Amelin Farm case, the San Antonio case, that the magistrate relies on for this point and several others in the decision. This is the only case that supports this proposition, suppose, proposition. It's really a Delaware law and not New York law, which implies that indentures must be read strictly. That case stands for the opposite conclusion. In that case, Vice Chancellor Lamb held that the issuer in a very close call under the indenture, sort of an ambiguous indenture, the issuer had the right to vote on a dissident slate of stockholders so long as it complied with the duty of good faith and fair dealing. That's also New York law. That's also New York law, yes. And so the case that the magistrate relies on effectively for the proposition that there is no implied covenant of good faith and fair dealing, that all that matters is form, not substance, stands for the opposite proposition. And so for all of these reasons, Your Honors, the specific terms in the honesty agreement violating the grant, the violations on the self-dealing provisions, and also the violations of the consent requirement, we submit that the decision below should be reversed, and we thank Your Honor for your time. Thank you. Thank you. Okay. I've been patiently waiting over there. I want to have the word reminded of a line from my cousin Vinnie. His closing argument when he gets up and goes, everything that guy just said is wrong. It's wrong, Your Honor. It's wrong. I've only seen it about seven times. I try to channel my best. So good morning, or afternoon, I guess it is now, Kim Evans with Grant Reisenhofer on behalf of the appellees. Let me just ask, when we get these cases on a cold record, immediate questions come to mind that are more practical than anything else. Why didn't you just seek U.S. Bank permission and the note holder's permission before entering into the odyssey agreement? Well, Your Honor, I mean, so I think the first misconception here is that this is a replacement to the special servicer. I'm sorry. There's a misconception. But it looks like under, it looks like, look, you know there's a significant argument, whether you agree with it or not, under 307C, that you have to get their consent. Was that intended to be done here? I mean, obviously there was concern that U.S. Bank was not getting the job done with regard to defaulted loans. Got it. Okay, we want to put somebody else in. We want to put somebody in that we can control. So it's going to be an entity which ultimately is controlled by VCG. Why not just ask permission? Was that done? I don't believe that it was done. However, it's our view that that was not required under the indenture. Then that's like going from first to third across pitcher's mound, isn't it? I'm sorry? It's like going from first to third across pitcher's mound without touching second base, which is getting their permission. Your Honor, the trust entered into a new agreement, and under the terms of the basic language of the indentures and all of the other basic documents, there was no requirement for note holder consent because that separate specific agreement – But 307C says what? 307C says that in the instance where something amends, modifies, waives, surrenders, et cetera, a couple things – And you tell me – The term – And the press has told us from New York that you've got to look at the effect of what's being done. And the effect of what's being done is that you are bypassing the special servicing substitute agent in favor of Odyssey. And that would seem to require – If the effect is to do that, it would seem to require consent. Respectfully, that's not the effect of the Odyssey agreement. The special servicing agreement remains intact. The special servicer is still servicing all of the loans that it currently has in its portfolio. And the waiver agreement was entered such that – These loans were entered into when initially? I'm sorry? When were these trusts first entered into? 2006, 2007? Something like that, yes. And the Odyssey agreement came out when, 2000? 2014. 2014. So after eight years, something happened and U.S. Bank was doing this, but now you're in effect supplanting them with regard to these loans in default. So let me give you a little bit of background if you'll indulge me quickly. So U.S. Bank took over as special servicer in 2012. In 2012, we started having major issues with the loan servicing. Billions of dollars of loans. As we used to say back in Ohio, no doubt about it. Exactly. So the trusts started losing money. A lot of these loans were not performing well, and the problem was the trusts were paying fees on the entire pool of the loan portfolio, even though these loans weren't actually generating revenue. So one of the things that the Odyssey agreement does is it provides a mechanism for which the trusts can sell non-performing loans to Odyssey in order to kind of stop the bleeding that was happening and reduce this pool of loans that are not performing well. Odyssey was permitted to purchase not only from the loans that inevitably it would end up servicing, but also across the entire portfolio. It was not limited to just their loans. They were not servicing any loans yet. That was the major point of this Odyssey agreement, was to provide this new mechanism to get rid of these non-performing loans, which the special servicer was not able to do. Let me ask a dumb question then. If U.S. Bank was doing the job up to snuff, as your clients perceived it should have been doing, would the Odyssey agreement have been entered into? I think the Odyssey agreement potentially could have, because if there was a need still to have to sell out these non-performing loans. But one of the things is that they're supposed to be sold, I was thinking at par, but actually I guess it says market rates. But it looks like the Odyssey agreement has – I mean, so many differences, the Odyssey agreement in terms of sales seems to be different from what the special servicing agreement is. I've got one. The special servicing agreement does not permit loan sales. The Odyssey agreement authorizes Odyssey to purchase defaulted loans at a purchase price that is 10% less than fair market value. The Odyssey agreement permits Odyssey to purchase certain defaulted loans at below market value, and that's not permitted under the SSA. The SSA sets a servicing fee at a certain way. The Odyssey agreement gives Odyssey discretion to determine its own servicing fee. The SSA allows the indentured trustee to remove the special servicer for cause. The Odyssey agreement allows for removal only with a prior written consent of the trust. And I could go on and on and on. There are so many differences here. And it would seem if you look at – under New York law, a precedent says look at the effect of what you're doing. The effect appears that you're displacing U.S. Bank for purposes of collecting on these loans, and you're doing it without consent. Your Honor, it is – but it's not. It's not displacing the special servicer. Odyssey isn't even in being hired as a special servicer. They're as an additional servicer. So can I just – I mean, this phrase – I don't know if it's the right phrase or not, but this notion of shunting. It sounds to me that if all the new loans are going to Odyssey to be served, but the preexisting loans remain with the preexisting servicer. And so if Odyssey were to step into and replace that preexisting servicer, that's counterfactual. You would agree with your opponents that there's all these problems, right? The reason you don't – it's not relevant here, but just in terms of narrowing the gap. If Odyssey were a replacement servicer, then there's a lot of problems that they need to do. They need – your point is it's not a replacement servicer that's consistent with the basic documents. We're an additional servicer with additional rights and possibilities, none of which offend the basic documents. If I understand the outline of your argument. But the question I'm wondering is would you at least go so far to say if Odyssey acted as a replacement, then there's real problems? So in the hypothetical situation where Odyssey was coming in to replace U.S. Bank, yes, there are a number of steps that need to be taken to fulfill obligations in order for Odyssey to become an actual special servicer. However, as we have briefed, that is not what happened here. We have a separate agreement. They're not even servicing loans right now or haven't been servicing loans at all. Who's the they? I'm sorry? Who's the they? Odyssey. Odyssey hasn't serviced any loans yet. The waiver agreement is in place tabling that. And that is not – the waiver agreement wasn't intended to – So is U.S. Bank doing all the loan servicing right now?  So then what was the purpose of having the Odyssey agreement entered into then? So the first priority of the Odyssey agreement was to start looking at the loan portfolios to audit them, consider which loans are appropriate for getting rid of because the amount of money that they're expected to generate is far outweighed by the servicing fees that are currently being paid to special – So the Odyssey agreement was entered into in 2014 with myriad different provisions and it hasn't been implemented in any way? No, Your Honor. The Odyssey agreement specifically sets forth not only the servicing but also the purchasing of loans. And there's a lot of requirements that go into – The servicing hasn't happened yet, right? The purchasing component has, right? The preparatory work – The waiver is extended to the servicing part. Am I following that right or not? Yeah. So the servicing piece – So let me just take a step back. The Odyssey agreement provides for two functions. One, for Odyssey to service newly defaulted loans that are referred to it by FIIA. And two – So referred to it by? By FIIA, who is the main servicer. And there's a bunch of steps that need to be taken for a loan to actually be considered defaulted. And then the second thing that the Odyssey agreement provides for is this mechanism for Odyssey to purchase loans from the trusts that are not performing. Well, the special servicing agreement does not permit loan sales. The Odyssey agreement does. And so, therefore, the effect of that would be a supplementing or an amendment or a modification or whatever you want to call it. No, Your Honor, because it's specifically provided in the indenture that such sales are allowed. Where is that? Section 3.14 provides the mechanism for how loans can be sold to the servicer. To the – and the servicer there – are you talking about the Odyssey agreement or are you talking about the special servicing agreement? Sales of student loans from the trust is specifically provided – Which 3.01 – 3.14. 3.14. J.A. 340. In which document? In the indentures. Read that again. Section 3.14 provides the mechanism for how loans can be sold to the servicer. It's in section – it's in the indenture. And does it allow for below par loans to be sold? So, it provides that loans can be sold to a servicer in accordance with the terms of a servicing agreement. And the Odyssey agreement is a servicing agreement. And it provides two specific ways for the price by which a loan can be sold to be determined. And those include – So, can I just back up? Sure. Well, you know the question. Come back to what you were saying. The mechanism for determining the price. Okay. No, go ahead. So, it sounds like the answer to this question as to whether the loans can be sold under 3.14 depends first on whether Odyssey had a legitimate or valid servicing agreement. Regardless of maybe the waiver agreement. And so, then if we have to answer that question antecedent to our analysis of 3.14, then why shouldn't we then antecedent to our analysis of 3.14 and obtain the objections to Odyssey as a servicing agreement that your opponent identifies? Could you – Oh, goodness. I don't know. I don't know if I can. I'm not sure if I completely followed what the actual question was. So, the question is this. It's – and stop me at any point in time if I've got it wrong. Yes. Okay. 3.14 talks about disposing of finance student loans. But in order for it to be triggered, there must be a separate servicing agreement that Odyssey is in. Is that right? Yes. Okay. Yes, I think that's right. Okay. I think that's right. So, then if that's the trigger for getting into 3.14 land, which may allow for the disposing and the sale of loans, don't we have to then first analyze the legitimacy or illegitimacy of the Odyssey servicing agreement? And wouldn't that entail looking at some of the items such as the 3.07 and all the other things that your opponents identify? The validity of the Odyssey agreement? Yes. So, it sounds like no matter what, we're back up there regardless of the waiver agreement. So, can I, I guess, step back to the granting – I guess the granting clause, because I think that that's kind of a big issue here. So, first and foremost, it's our view that that argument was waived. It was not presented to the magistrate judge. The district court held that arguments not presented to the magistrate judge should be deemed waived. The argument didn't appear in the petition. There was no discovery taken on that specific issue. It didn't appear in the summary judgment briefing. And, you know, some passing mention of it in a Me Too statement by the note holders early on. Is that the argument that the Odyssey agreement does not violate the granting clause by appointing another servicer? Is that the one you're saying is waived? Yes. The argument that the trust has somehow – don't have the right to hire Odyssey or enter into the Odyssey agreement because they purportedly assigned that right to U.S.C. Okay. That is the argument that we're claiming was waived down below. It was kind of an afterthought that was just raised in the objections to the reports and recommendations by the magistrate judge. And, you know, allowing that argument to be raised now would undermine the entire magistrate process. And, you know, we've cited cases in our brief that confirm that. All of the cases that are cited by the appellants on this issue either didn't involve an issue that was before the magistrate judge or didn't involve a magistrate judge altogether. So regardless of waiver, the granting clause does not say what the appellants claim that it does. It gives an indentured trustee a security interest in the payment of principal and interest on the notes for the benefit of the note holders. Okay. All right. Right there. You said that in your brief. I picked up on that in your brief. I read the granting clause, and I didn't see the securitization. Could you walk me through that? Sure. Hold on. Let me just find it. So if you look on JA-318, I guess the penultimate full paragraph above Article I, the foregoing grant is made in trust to secure the payment of principal and or interest on, as applicable, and any other amounts owing in respect of the notes equally and ratably without prejudice, priority, or distinction, except as otherwise provided for herein, and to secure compliance with the provisions of this indenture, all as provided in this indenture. So that clause provides the scope of this granting clause, and it's not a wholesale assignment of all of the trust obligations under the basic document. By definition of the very term grants, which is another term in the indenture. So can I just tease this out? Yeah. I see the penultimate paragraph, but then I see the very top phrase on 318 that says, and I'm jumping in the middle, all the issuers write title and interest in and to the following. So doesn't that confer a different property interest than merely a security interest, a broader property interest? Sure. So I think to answer your question, we need to remember here that this indenture is related to a bunch of other documents, and the granting clause itself is subject to the other terms that are also set forth in the rest of the indenture. So there's limitations on the clauses that are set forth in the top part of that grant. It's not just an absolute assignment of everything and anything as appellate suggests that it is. So specifically it says it's subject to the terms of the indenture. So what does the indenture actually say? Well, they specifically disclaim the indenture trustee's obligation to participate in the servicing process. And if you look at Section 601H, and that's on JA 360, it says, except as provided in the basic documents, the indenture trustee shall have no obligation to administer, service, or collect the finance student loans, or to maintain, monitor, or otherwise supervise the administration, servicing, or collection of the finance student loans. The indenture trustee is also made very clear that it disclaims any obligations that are not expressly provided for in the indenture. And you can see that in an example of that on JA 814. It's a March 6, 2002 letter from U.S. Bank to VCG that says, however, to be clear, we do not assume or undertake any obligation beyond what is required of us by the applicable indentures. So because the indentures are clear that loan servicing and the monitoring of loan servicing falls outside the purview of the indenture trustee, the trust retained that obligation under the basic documents. So the granting clause does grant a security interest, correct? It grants a security interest, yes. I mean, if it doesn't, we don't have a deal. Absolutely. I mean, the purpose is to give the indenture trustee the authority to do what it needs to do in order to collect money and pay the new holders. That's what the granting clause is about. That's part of the collateral. The other part is, in effect, the so-called backup guarantee. Unfortunately, the outfit Terry went under. Sure, sure, sure, exactly. But they've expressly disclaimed any responsibility for servicing under the indenture. And the trust, one of their basic rights in Section 2.03, or their basic purposes, powers, obligations, Section 2.03 of the trust agreement, is entering into agreements with servicers and conserving trust property. So this is something that's specifically provided for and contemplated that the trust would maintain. But any time the effect is to amend or supplement or change the documents in terms of what you're doing, you need to get consent. To the extent that one of those provisions that require consent is triggered, yes, you would need to get consent. But it's not an absolute thing. So the service agreements are outside of that, is what you're saying? So let me put this in perspective. No, the service agreements are included, right? So one of the arguments that my friends make is that the owners have a unilateral right to amend the obfuscate agreement in any way for their own benefit. That's not the case. So in our view, this is now a basic document. It's an executed ballot agreement. But what is this? You said this is now a basic document. What are you referring to? The odyssey agreement. Yes, I'm sorry. But the servicing agreement is a basic document, correct? The special servicing agreement is a basic document. The odyssey agreement is also a basic document. And 307C prohibits any alteration to any basic document that would waive, amend, modify, supplement, or terminate the basic documents without the consent of the indenture trustee and the note holders. It's not just amending the document. It's amending the terms of the document. And the odyssey agreement does not do that. No, but it certainly supplements it because it has many different provisions that relate to the provision of loans in default that otherwise would be done by U.S. Bank. And you're telling me, even since 2014, they're still being done by U.S. Bank. No, Your Honor, it's not a supplement. It's a completely separate document. The terms remain completely intact on the SSA. It functions the same exact way. There's no requirement in the indenture that these two contracts have the same terms. If you could, in some way, attempt to shape this deal or affect this deal, then, or the collection of defaulted loans, then why was it entered into in the first place? Why was the odyssey agreement entered into? Yeah. To construct a mechanism to stop the bleeding and preserve the assets of the trust, which, by the way, ultimately benefits the interested note holders here, which is something that we're forgetting. This is not just the owner coming in trying to unjustly enrich themselves here. They're trying to conserve the property in everybody's interest to do this. And so one of the things that they identified as a means to do that is to provide a mechanism to take all of these non-performing loans that we can't collect on and sell them. And there's a price determined. So let me answer your question. So the odyssey agreement provides two ways for the – and remember, the indenture says that it's permitted – the process is permitted as long as it's in compliance with what it says in the servicing agreement. The servicing agreement, which is the odyssey agreement, provides two ways, which is the highest bid received from at least three qualified buyers or the average value determined from the appraisal values of two reputable appraisals. This is not odyssey setting any price that they want. There's a 10% fee that odyssey retains on each loan, but that's a far cry from this unjust enrichment situation. Let me give you an example here. So under the original agreement, the special servicing agreement, we have a loan that's a $100,000 loan, and we're only expected to get $1,000 of the collectible revenue on that loan. Under the SSA, the trusts are paying $1,000 in servicing fees on that loan because we're basing it on that $1,000. In the situation with odyssey, if they were to buy that same $1,000 loan, the trust would only pay a $100 fee. So that's an extra $900 in the note holder's pocket. That loan is now out of the portfolio, so we don't have to worry about that anymore. In the other situation, that non-performing loan is still in the portfolio, and we're still paying that $1,000 on that non-performing loan in servicing fees. So this is a benefit to everyone, including the note holders. The other hypotheticals about how odyssey can unilaterally change the terms to benefit itself for the owner's benefit also doesn't make any sense. The odyssey agreement itself has a very limited amendment right. It can only be in Section 15. It only permits an amendment to add additional trust. Moreover, as I said earlier, once this became a basic document, it needs to, if the trust wants to amend, they need to jump through a bunch of hoops to do that, including the consent covenant and including the rating agency provision condition. So none of these issues are even relevant here. Can you talk about the for-cause termination issue? For-cause. So the argument is that the owners have, the trust needs to retain, or the indentured trustee can request removal for-cause. The special servicing agreement allows the indentured trustee to remove the special servicer with cause without the consent of the trust, but the odyssey agreement allows for the removal of odyssey only, quote, with the prior written consent of the trust. Right. Once with and once without. So that is a condition in the odyssey agreement, but what we haven't established here is where in the indenture does it say that that's not appropriate. There's no requirement in the indenture or any of the other basic documents that require the terms of the special servicing agreement to match those in the odyssey agreement. And the fact that the trust needs to approve any removal for-cause is just a different term. In fact, another term that is in there is that if the odyssey is removed for-cause, the indentured trustee has to approve any replacement. So there's gives and takes here. It's not just all one-sided. And, I mean, I have a ton of examples of, you know, exactly why this is an arm's length agreement. We have both of the owners of the trust at the time agreed to hire odyssey. The agreement was negotiated with lawyers on both sides. Wilmington Trust is a signatory. The indentured trustee- But, in effect, aren't the rights of U.S. Bank in some way altered? They haven't been. Not yet? No. Well, I mean, what happened after 2014? They went to court to try to stop this. Is that right? Yeah, I mean, quite frankly, U.S. Bank has ignored a number of directives that the trust have given. And one thing, just going back quickly to the granting clause, even if we view that clause in the broadest terms, that clause does not grant away the owners because these are owner-directed trusts. The owner's right to instruct the trust to take action. That is not a right that is granted in any way. And the special servicing agreement is, by definition, a basic document, is it not? Correct, yes. All right, I have no further questions. Just to round out the four-cause point, you said both owners agreed to it, but now there's only one owner and that owner is an affiliate of Odyssey. So, I mean, doesn't that change things so that you've got an affiliate and even if it must be done under market rate deals and market rate terms, it's never going to happen or very unlikely to happen and that is inconsistent with a market rate approach? I'm actually glad that you raised that because that was a statement that I wanted to correct and had forgotten. And you mentioned, so both of the owners, VGC and Citibank at the time, were the ones that approved it and my friend on the other side said it's now just VGC. That is not the case. There's still another owner. I can't recall off the top of my head who that is at the moment, but I do know that there are two. It's a minority interest, but there are two. But still, VCG's consent is necessary. It can't happen without it. Sure, and there's nothing in the indentures that prohibited that. In fact, it's expressly permitted. But isn't the part that would arguably prohibit it is dealing with affiliates at non-market rate provisions and if you have a four-cause that requires an affiliate's approval, that might not necessarily be a market condition that anyone could get? There's also a provision in the Odyssey Agreement that requires Odyssey to deal with any affiliated entity in a way that would benefit the trust in the same exact way as an unaffiliated entity. So there's multiple protections here. It's not just the owners having all of these rights with no check. So that approximates a market rate transaction, but is that the thought? Market rate has to do with the value of the loans that are going to be filled. A market rate term doesn't relate to approval of an entity. I would interpret market rate as relating to the payment terms, the servicing fees, the rates at which they're being compensated. That's the market rate. If the market rate doesn't modify this, then aren't we up to the first clause, which says arm's length, and then maybe this isn't arm's length because there's an affiliate on both sides? That's contemplated by the indenture itself. The indenture contemplates the trust dealing with owner's affiliates in various respects. That's something that history has shown to take place. The original owner hired an affiliate as the administrator and entered the administration agreement. So these are things that have happened. I can cite you the provision that allows for this. It's Section 3.23 of the indenture, which compensates dealing with affiliates as long as they're arm's length and at market rate. So I know I'm running out of time here. I've been out of time. Is there anything not in your briefs that you wish to add? I'm sorry? Is there anything that we haven't covered?  The one thing that I would like to just mention here, because we haven't talked about it at all, is the payment of invoices. The payment of Odyssey's invoices, also. Is there some type of... Which is the issue with the guidance? Let's say you're not authorized, and you're saying, you said you haven't done any collecting, so what would you submit the invoices for? So the invoices are... This is a very simple issue, okay? The trust hired Odyssey to perform work related to not only servicing, but also selling these loans. In order to do that... And also... Selling... Or purchasing, I'm sorry. Purchasing non-performing loans from the trust. So once Odyssey was hired, they were put onto that specific task. They were assessing the portfolios. They were conducting audits. They were looking at the loans. They were doing valuations. They were figuring out which loans were right to be sold or purchased. It sounds like that's what a servicer does, but go ahead. I'm sorry? Is that what a servicer does? The special servicer is not assessing loans for sale. The bottom line is... Maybe I took you off track here. You're submitting invoices. They haven't been paid. And the question is, you would like them paid under what theory? Under the theory that all of the requirements for payment of invoices, there's a specific process in place. And that process is... Provided that this is a, in effect, becomes one of the basic documents. Isn't that correct? Correct. So the Odyssey agreement has to become a basic document. In order to become a basic document, you need consent. It seems like we have something that becomes illogical. There is no consent requirement for the Odyssey agreement. And it was submitted in such a way, it was provided to the owner-trustee. The owner-trustee is the valve here for all of these things. If they don't... They have the right to seek information about the invoices, information about the Odyssey agreement. They're the safety check. And, in fact, in other cases, which has led to litigation, they've done that. They've said, no, this doesn't seem right and have not passed it on. But the process is it goes to the owner-trustee. The owner-trustee sends it to the administrator. We're assuming for the moment... How much are we talking about altogether so far that's been submitted, roughly? I think it's roughly like $1.4 million, something along that. And so if we determine that that document is invalid for purposes of payment, then if you've done something that benefited the deal here, the trust, et cetera, is it a constructive contract theory? Is it an unjust enrichment theory? What are you basing your theory on if, for some reason, we say that the Odyssey agreement is not valid for purposes of this deal? Well, Your Honor, I mean, that's not something that we've briefed. But I would say, ultimately, it would be an unjust enrichment type of situation here because they've done work in furtherance of a purpose that the trust sought them to do, and they haven't been paid for it. Okay. Oh, quite a narrow one. Yeah. Yeah. Yeah. Thank you, Your Honor. Thank you. I think that's everything for me. Thank you. Well over half an hour. Thank you. I bet you held up well. Unless the Court has additional questions, there's nothing further. Bless you. Well, one question I do have, just one, if you could do it. Would you address the waiver issue? Sure. The district court judge, Battalion, specifically addressed the granting clause issue. There's a paragraph in his decision where he says, I find arguments in our case. Who says? District court judge. Battalion. Battalion, okay. I'm sorry. Right, right, right. Specifically ruled on the granting clause issue. There's a lead-in paragraph up to the paragraph where he interprets the granting clause, where he says, arguments not raised are waived. He didn't construe it as waived, however, because he ruled on the granting clause, nor should it be waived, because as our reply brief points out, it is in the record. It was in our motion for summary judgment in front of Magistrate Judge Fallon. It was also in, it's made part of the hearing transcript. The granting clause issue is raised in the note holders brief as well, in front of Magistrate Judge Fallon. It is also, as I said, a part of the record in our objection to the report and recommendation of Magistrate Judge Fallon. It was in our affirmative brief as well as our reply brief, too. So it's been raised at every level of these proceedings. Thank you. If I may, with the court's indulgence and at the risk of predicting I can do this in less than one minute. No, you can't. You're not a government lawyer, are you? I want to just, because the granting clause waiver argument is one that has always been a head-scratcher for me. I want to read from the submission that we made to the Magistrate Judge below. In the granting clause of the indentures and in order to secure payment on the notes, the issuer is granted to the indenture trustee for the benefit of the holders of the notes. All the issuers write title and interest in, among other things, all servicing agreements. In accordance with these fundamental grants, granted to the indenture trustee, additional things. Note holders are third-party beneficiaries of the special servicing agreement. Then we say this. Simply stated, the issuer's attempt to abrogate the special servicing agreement without note holder approval repudiates the issuer's grant to the indenture trustee on behalf of the note holders of the right to service loans. This is precisely why Section 3.07 requires consent. The argument was not raised. I'll leave it at that to get through in a minute. Thank you very much. We get a transcript of the argument, as many vibes as that may take. The cost of the transcript. Mr. Lombardo, he can instruct you on how to do that. Thank you.